FRANCIS LEO MCCURRY, Appellant, v. GUY A. THOMPSON, Trustee of the Missouri Pacific Railroad Company.—No. 38627.—181 S. W. (2d) 529.

Division One, June 5, 1944.

Rehearing Denied, July 3, 1944.

*W. W. McCanles, O. D. Robertson* and *Gayles R. Pine* for appellant.

*Thomas J. Cole, L. J. Bishop, D. C. Chastain* and *Patterson, Chastain & Smith* for respondent.

1202

DALTON, C.—Action under the Federal Employers' Liability Act (45 U. S. C. A., Sec. 51, et seq.) for $50,000 damages for personal injuries alleged to have been sustained on account of defendant's negligence. Verdict and judgment were for defendant and plaintiff has appealed.

A statement of the evidence most favorable to plaintiff is required. Plaintiff was employed in defendant's shop at Hoisington, Kansas. On March 27th, 1941, he and other employees were engaged in shortening an iron drawbar of a locomotive used in interstate commerce. One end of the drawbar was heated and laid across an anvil and hammered with a steel ram while the other end was supported by a chain. The ram used was an 8 foot 4 inch steel bar, weighing 436 pounds. It was 7 inches in diameter at one end and only about 2 inches at the other. An eyebolt had been put through the ram so that when suspended by the eyebolt the ram would hang level.

In order to use the ram, it was supported from the ceiling by a short chain, a 14 foot iron bar with a hook at each end and an open link connecting with the eyebolt of the ram. When the ram was in use a man stood on either side of it and swung it like a pendulum, while plaintiff stood at the small end of the ram to guide it so the large end would hit the heated end of the drawbar.

When the work was finished, plaintiff and the two men working with him swung the ram toward the drawbar, but with the large heavy end of the ram raised high enough to pass over the drawbar. They then let this end down on top of the drawbar by raising the small end of the ram. After having placed as much of the weight of the ram as possible on the drawbar, the three men continued to raise

the small end of the ram to disconnect the hook or open link on the rod from the eyebolt on the ram and, in order to do so, the small end of the ram had to be raised higher than the top of the drawbar. At this time plaintiff stood at the small end of the ram, had his hands around it and had, with the aid of the others, raised it to his chest to have enough slack for the disconnection to be made. Employees Whitt and Jonas were standing on either side of the ram assisting plaintiff, to support the small end of the ram. Plaintiff said that immediately after the rod was disconnected from the eyebolt of the ram, and while all three were holding the ram, Whitt and Jonas "turned loose and jumped away," jumped to one side, dropped it, and let plaintiff have the weight they were holding; that, at the same time, the big end of the ram dropped to the ground and plaintiff got a blow on his chest that knocked him against a big steam hammer; and that "it just felt like something burst, just like a knife or something went through there." Three or four minutes later, plaintiff fell to the ground and he was then taken to the hospital.

At the time Whitt and Jonas released the ram and jumped away, they were standing close to it and had their backs to plaintiff. Plaintiff could not see what they were doing. He did not see them let loose, but he got the weight of the ram when they turned loose and about that time the big end of the ram hit the floor and he got the blow. The ram did not turn or roll off the drawbar and plaintiff didn't pull it off, or know how it got off. It fell and the motion of the ram knocked plaintiff backward and he let go of the ram. He didn't know the ram was loosened or unhooked until it hit the ground. Later, plaintiff's chest was swollen and black and blue from the blow.

Plaintiff further testified that he knew the ram was pushed upon the drawbar for the purpose of being lowered to the ground; that he knew it was going to be unhooked; that he didn't know it had been unhooked; that he had given no notice to drop the ram; that neither of the men had said a word; that they had never dropped the ram that way before; that it was the custom, after the heavy end of the ram was on the drawbar, for all three to continue to hold on to the ram until plaintiff (the end man) said "all right" and then all turned it loose and dropped it to the ground; that after a signal by him "they would give it a pull and jump to one side"; and that that was the way they always did it. Plaintiff said that rolling the ram off the drawbar was not the way they took the ram down. Other facts will be stated in the course of the opinion.

The cause was submitted upon the second assignment of negligence in the petition, to wit, "that although there was a long established practice and custom on the part of the defendant's employees which was well known to the plaintiff and the defendant's employees that after having finished work with the steel ram . . . the said employees . . . would lift same so that the steel rod could be un-

hooked therefrom and to hold up the weight of said ram until all of said employees were in position to drop said ram without injury to said employees and . . . not to release their hold or drop said ram until proper warning had been given that they were about to do so and upon a signal from said employees, the said defendant's employees and servants, Edward Jonas and Jack Whitt, in violation of said custom and practice, carelessly and negligently, without giving any warning or signal to plaintiff that they were about to do so or without receiving any signal or warning from the plaintiff for them to do so or that he was in a position of safety, carelessly and negligently let go of said steel ram suddenly and permitted the full weight thereof to strike against the plaintiff and to fall upon him causing his injuries as aforesaid.''

Appellant assigns error on the action of the court in giving Instructions G, H, I, and L, requested by defendant. Respondent insists that the instructions are immaterial because plaintiff failed to make a case for the jury. Respondent contends that ''there is no evidence whatever to sustain the charge (of negligence) in the petition''; that there was no proof that appellant was injured by the sudden release of the ram; that appellant ''nowhere testified that he received his injury when Whitt and Jonas let go of the ram,'' but claims he received his injury ''when the ram fell . . . off the drawbar onto the ground.'' It is respondent's theory that there was no causal connection between the alleged negligent conduct of Jonas and Whitt and appellant's injury; and respondent insists that this court should hold, as a matter of law, that the negligence charged was not the legal or proximate cause of appellant's injuries. We think the evidence was sufficient for the triers of the fact to draw the inference that the sudden release of the ram by Whitt and Jonas threw the weight on appellant and caused the heavy end of the ram to slide or fall off the top of the drawbar and thus caused the small end of the ram to strike appellant. In fact respondent so concedes by further argument that ''there was no proof that would support a judgment under the petition,'' because ''the negligence in the petition was the sudden letting go of the ram, and the letting of the weight thereof fall upon plaintiff causing his injury,'' while ''the theory submitted under the plaintiff's instruction *and under the plaintiff's own testimony* was negligence in dropping the ram and causing the large end of the ram to fall from the drawbar on which it was resting and strike the ground, and causing the small end of the ram to strike plaintiff.'' (Italics ours.) We think the evidence warranted a finding that the negligence charged was the proximate or legal cause of plaintiff's injury, since it appears that the injury to appellant was the natural and probable consequence of the negligence shown and that appellant's injury ought reasonably to have been foreseen in the light of the attending circumstances.

■ Respondent next contends that there is no "proof of a custom to give any warning when the two men at the eye bolt let loose of the ram" and that the custom testified to was that "when the link was unhooked and the ram was let down to its former position, that appellant would then call out to the men to let go." While there is no proof of custom to give any warning when the two helpers let loose of the ram, there was evidence of a custom that they should not let go of it, until they were directed to do so by appellant and, in letting go prior to that time, they violated the custom and gave appellant no warning that they were going to do so. The evidence concerning the custom, and violation of same without warning, amply supported the charge of negligence in the petition.

■ Respondent further contends that appellant made no case for a jury because there "is no explanation or denial of the truth of the fact which he set up in his compensation claim." Respondent's theory is that appellant's testimony at the trial was in irreconcilable conflict with the facts stated in a claim filed by him with the Workmen's Compensation Commission of Kansas and later dismissed. Respondent insists that appellant is conclusively bound and estopped by his prior claim; and that a jury should not have been permitted to speculate or guess which statement was correct. In his claim, filed against respondent, with the Workmen's Compensation Commission of Kansas, appellant gave the date of the alleged accident and stated the cause thereof to be "unusual and violent exertion other than what claimant was accustomed to" and he described the nature and extent of his injury as "heart attack rendering the claimant unfit for other work." Appellant admits that he signed and swore to this claim against respondent, but testified that his attorney prepared the claim; that he told him "the whole story before he prepared it"; and that the attorney filled in the claim form, as above quoted. Respondent relies upon Steele v. Kansas City Southern R. Co., 265 Mo. 97, 175 S. W. 177; Goslin v. Kurn, 351 Mo. 395, 173 S. W. (2d) 79, 86; and Stevens v. Thompson (Mo. App.), 175 S. W. (2d) 166. We think these cases are not applicable here in view of the fact that the claim referred to had been filed and withdrawn by appellant prior to the institution of the present suit. The statements contained in the prior claim were insufficient to prevent the submission of the case to a jury upon the testimony in this record. Steele v. Kansas City Southern R. Co. (second trial en banc), 302 Mo. 207, 257 S. W. 756, 759; Parrent v. M. & O. R. Co., 334 Mo. 1202, 70 S. W. (2d) 1068, 1074; Edmonston v. Kansas City, Missouri (Mo. App.), 139 S. W. (2d) 1073, 1075.

■ Respondent further contends that upon appellant's own evidence there was no duty to warn him because appellant saw or could have seen that the ram was going to be dropped. It is further contended that the end of the ram turned in appellant's hands even

though he testified to the contrary and that his testimony is without probative value because contrary to physical law. It is further insisted that the removal of the hook from the ram, and the acts of Whitt and Jonas and the turning of the ram on the drawbar all gave appellant actual notice that the ram was going to be dropped and the failure to warn appellant was not the proximate cause of his injury. These contentions are based upon evidence which was contradicted by appellant's testimony, except the argument that appellant's testimony to the effect that the end of the ram slipped off or fell from the drawbar without turning, was contrary to physical ·law. We see nothing in this statement that appears improbable, particularly in view of other testimony in the record.

It is next insisted that appellant was in a position to see that the ram was going to be dropped and that Whitt and Jonas could assume that he was looking and, accordingly, there was no duty to warn. This argument ignores appellant's testimony that Whitt and Jonas had their backs to him and he could not see what they were doing; and that according to established custom and practice the ram was not to be dropped, even after it was released from the rod, until a signal was received from appellant to drop it.

It is finally insisted that any failure to warn was not negligence as to appellant, because the warning was by custom to be given by him for the benefit of Whitt and Jonas, who were at the heavy end of the ram; that appellant was not one of the class to whom a duty to warn existed; and that the purpose of the warning was to prevent injury to the feet of Whitt and Jonas, and not to prevent a blow by the end of the ram against appellant. We think the evidence entirely sufficient to show that the purpose of the custom to wait for a signal by appellant was for the protection of the three persons supporting the end of the ram and was not limited to the two persons to whom the notice was given, nor was its purpose limited to the protection of their feet. The evidence sufficiently shows that the custom to wait for appellant's signal was for the general safety of all three persons. The demurrer to the evidence was properly overruled and a review of the instructions is required.

Instruction "G" is as follows: "The Court instructs the jury that if you find and believe from the evidence that the sole proximate cause of the accident, if any, was the failure of the plaintiff to let loose of the ram when he saw it was being dropped and rolled off the drawbar, then you will find for the defendant, and your verdict must be for the defendant."·

Appellant contends that the instruction "assumes that the plaintiff saw the ram was being dropped and rolled from the drawbar, which was in direct conflict with his testimony"; and that the instruction "invades the province of the jury in passing on a material issue of fact." Respondent, on the other hand, contends "the instruction

does not assume a controverted fact because it required the jury to believe that the proximate cause of the accident was the failure of the plaintiff to let loose of the ram when he saw it was being dropped and rolled off the drawbar,'' and that, ''if he did not see it was being dropped, the jury could not find that there was any failure on his part to let loose of the ram'' or that ''that was the proximate cause.'' Respondent relied upon Hill v. St. Louis Public Service Co. (Mo. Sup.), 64 S. W. (2d) 633, 638 and other cases, which are not controlling in view of the form of the instructions considered. Respondent further says that the instruction could have properly assumed that appellant did see his two companions let loose of the ram. We think that instruction ''G'' erroneously assumes, without requiring the jury to find such fact, that appellant saw the ram was being dropped and rolled off the drawbar. Such an assumption is directly contrary to appellant's own testimony that he did not see and could not see the men drop the ram; that he did not know they were going to drop it and that he had hold of one end of the ram and it did not roll off the drawbar. An issue of fact was made for the jury. Respondent's instruction ''H'', however, recognized and submitted, as an issue of fact, whether ''the plaintiff was in a position to see . . . and could see that the ram was going to be dropped and rolled off the drawbar'' and accordingly the jury may not have been misled by instruction ''G''. Because of this circumstance and the fact that there are other errors in this record it will be unnecessary for us to rule that the giving of instruction ''G'' was reversible error.

Instruction ''H'' is as follows: ''The Court instructs the jury that if you find that the plaintiff was in a position to see Whitt and Jonas and their movements and could see that the ram was going to be dropped and rolled off the drawbar in time to let loose of the same, then there was no duty on Whitt or Jonas to warn or to wait for any warning or orders by the plaintiff and your verdict must be for the defendant.''

Appellant says that the effect of the instruction was to direct a verdict for defendant and to abolish the law relative to rules and custom and the right to rely ▉▉ on them; that the instruction in effect ''told the jury that the violation of the rule, custom and practice as to warning or signal did not constitute an act of negligence upon which the plaintiff could recover''; and that the instruction ''ignores the negligent violation of the rule, custom and practice with respect to giving orders and signals.'' Respondent in reply says that the instruction is based upon appellant's own testimony that he saw the ram resting upon the drawbar; that he assisted in putting it up for it to be unhooked; and that he knew it was going to be dropped. Respondent insists that there was no duty to give appellant any further warning; that appellant's own voluntary act in failing to let go of the ram was the proximate cause of his injury; that the instruc-

tion "goes to the proposition of proximate cause"; and that "if the plaintiff was in a position to see that the ram was to be dropped and rolled off the drawbar, and did know such fact, the warning would be of no help to him, and no negligence could come from the act of failing to warn."

We think the instruction clearly failed to require a finding that appellant could and did see that the ram was going to be dropped in violation of the custom to wait for appellant's signal and that it was going to be dropped without any further warning to him. The instruction does not require such a finding of fact as would relieve respondent from compliance with the established custom and practice of waiting for appellant's signal or of the duty of giving warning to appellant that the ram was going to be dropped without waiting for such signal. The instruction is erroneous and misleading.

Instruction "I" told the jury "that if you find and believe from the evidence that the plaintiff's injury consists of coronary thrombosis or coronary occlusion, then there is no evidence that such injury was caused by any acts of negligence charged and your verdict will be for the defendant." Appellant says this instruction amounted to a directed verdict against him. Respondent contends that there was no competent evidence that the coronary thrombosis or coronary occlusion was caused by the alleged occurrence upon which the suit is based, or that "appellant suffered a coronary occlusion as the result of the trauma." Respondent further insists that "there is no opinion that plaintiff's injury did result from trauma"; that there can be no recovery "if plaintiff's injury consists of coronary thrombosis or coronary occlusion"; and that "even a positive opinion must have evidence to support its reasons and testimony which will give it sufficient probative force to be substantial evidence." Kimmie v. Terminal R. R. Ass'n. of St. Louis, 334 Mo. 596, 66 S. W. (2d) 561, 565; Adelsberger v. Sheehy, 332 Mo. 954, 59 S. W. (2d) 644.

The petition charged that plaintiff was bruised about the chest and caused to suffer a severe injury to his heart. Plaintiff's main instruction required a finding that the small end of the ram struck "against plaintiff's abdomen and chest with force and violence . . . which caused plaintiff to be injured." Coronary thrombosis or coronary occlusion was not mentioned therein, but the evidence shows that prior to March 27, 1941, appellant had never suffered with heart trouble; that on that day he received external physical injuries, as stated; that a few minutes later he fell to the ground and was promptly taken to a hospital; and that he now suffers disability from coronary thrombosis or coronary occlusion. Respondent's Instruction "D" assumed that appellant suffered a heart attack and told the jury that "if you are unable to determine whether the heart attack which the plaintiff suffered was caused or brought on by any negligent act of defendant or by natural causes, then your verdict should be for the

1210

defendant." Respondent's Instruction "E" told the jury "that the mere fact that plaintiff suffered a heart attack following the performance of work for the defendant is no evidence that the same was occasioned by the work which plaintiff had been doing."

Appellant's witness, Dr. Russell Hodge, a physician and surgeon, examined appellant in October 1942 and, after detailing the type and kind of examination he made, testified, "I came to this conclusion from all these things there must be some weakness in the muscles of the heart due to injury to the blood vessels that had been injured and which had caused the blood vessels supplying the heart to lose strength and this man's heart was not strong enough to give normal blood pressure. He didn't have the heart beat of a normal individual and his pulse resulting from that heart was not normal and therefore my conclusions are that this man's heart was damaged by this injury and was abnormal at the date of these physical findings when I went over him." In answer to an extended hypothetical question the witness gave it as his opinion that "this sudden striking caused the rupture of some of the muscles of the heart, and it could cause some bleeding the same as an occlusion and I believe there was some damage to the coronary artery itself, and this damage caused a depletion of the supply of blood reaching the heart itself and made the pain similar to angina pectoris." The witness further, testified: "Q. State why you have stated in your opinion this condition was the result of this injury? A. From my reading of books concerning trauma to the chest and heart conditions and from information concerning autopsies following accidents in which the heart was involved gained from books written by Dr. Paul White of Yale University I have formed this opinion. On cross examination, Dr. Hodge was asked about plaintiff's condition and said: "He has this coronary condition." Counsel then proceeded. "Q. What do you call that? A. I call it a coronary thrombosis or occlusion. Q. That is what he suffered, a coronary occlusion? A. Yes, sir."

Dr. Edward Andruss, a homeopathic physician, examined plaintiff and testified: "A blow on the chest could cause injury to the heart, the muscles of the heart and the blood vessels. . . . This blow, if I understand the blow right, was in the center of the chest and about the apex of the heart and that is where we get the beat and a blow there would have some effect on the heart and no doubt would injure the muscles of the heart and the blood vessels. Q. And in your opinion it could have caused the condition that I have described? A. Yes, sir. . . . Q. If he never had any trouble before 'and he did receive this violent blow, in your opinion it was the direct or indirect trauma that caused this coronary occlusion? A. Yes, sir. . . . Re-cross Examination by Mr. Chastain. Q. You are assuming that he did receive a severe blow? A. Yes, sir. Q. And that would have to be a crushing blow? A. Not necessarily."

Respondent concedes that, according to the testimony, Dr. Hodge's "physical examination of appellant showed that he (appellant) had a disabled condition of the heart" but respondent insists the witness took the word of a heart specialist that appellant's exact trouble was a coronary thrombosis, or occlusion, as testified to by other witnesses. Respondent further says that, while Dr. Andruss testified that the condition (of appellant's heart) which he found was the result of trauma, the witness did not say that he found appellant to be suffering from a coronary occlusion, and that Dr. Andruss' "testimony was not of any probative force." We hold that there was substantial evidence tending to show that the blow appellant received on his chest caused the coronary thrombosis, or coronary occlusion from which he now suffers and that the court erred in giving Instruction "I".

Instruction "L" told the jury that "plaintiff assumed the risks which were ordinary and incidental to the doing of the work in which he was engaged at the time he claimed that he received an injury, insofar as such risks were incident to his own actions and his own physical strength and physical condition," and that if he was "injured by the lifting and straining in the handling of the ram," and not by defendant's negligence he "assumed the risk of such injury" and could not recover. Appellant contends the instruction was confusing, misleading and prejudicially erroneous. Tiller v. Atlantic Coast Line R. Co., 63 S. Ct. 444, 449; 45 U. S. C. A., Sec. 54. Respondent says that "if plaintiff was injured due to his own actions and physical strength by lifting and straining and not by any negligent act on the part of any other employee, there could be no recovery"; that the instruction does not submit "an issue of assumption of risk"; that an abstract instruction is not reversible error, unless the complaining party was prejudiced or the jury misled; and that all the instructions when "construed together" correctly stated the law. Respondent contends that, while the Tiller case holds that "the 1939 amendment to the Employers' Liability Act," released "the employee from the burden of assumption of risk by whatever name it was called," the concurring opinion of Mr. Justice Frankfurter (63 S. Ct. 444, 453) pointed out that the amendment "has left undisturbed the other meaning of 'assumption of risk,' namely, █ that an employee injured as a consequence of being exposed to a risk which the employer in the exercise of due care could not avoid is not entitled to recovery, since the employer was not negligent." Respondent says that, notwithstanding the amendment excluded assumption of risk as a defense, there can be no recovery under the act for any injury resulting solely from the employee's own fault (Willis v. Penn. R. Co., 122 Fed. (2d) 248, certiorari denied 62 S. Ct. 187) or where the employer was not negligent. Brady v. Southern R. Co., 64 S. Ct. 232.

1212

We think the instruction was confusing, misleading and erroneous. The matter of assumption of risk was not an issue or defense and had no place in the instruction.

Respondent's motion to dismiss the appeal for alleged violation of certain rules of this court is overruled. The judgment is reversed and the cause remanded. *Bradley* and *Van Osdol, CC.,* concur.

PER CURIAM:—The foregoing opinion of DALTON, C., is adopted as the opinion of the court. All the judges concur.